# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

LC AMERICA, INC.,
**Plaintiff,**

                                  **3:13-CV-00625-RJC-DCK**

**v.**

**NIRVANA SPECIALTY FOODS,
INC.,**
            **Defendant.**
_____


### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM



**MILLER WALKER & AUSTIN**
**Attorneys at Law**
**319 S. Sharon Amity Road, Suite 350**
**Charlotte, North Carolina 28211**
**Tel.: 704-366-9129**
**Fax: 704-366-2686**

1

# I PRELIMINARY STATEMENT

Comes now Plaintiff, LC America, Inc, and files Plaintiff's Response in Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim. Though Defendant does not specify which Federal Rules of Civil Procedure it relies upon in the filing of the instant Motion, Plaintiff presumes that said Motion was filed pursuant to Fed. R. Civ. P. Rules 12(b)(2) and 12(b)(6). Plaintiff respectfully requests this Court to deny Defendant's Motion to Dismiss for the following reasons:

      1.      The Defendant's acts equated to sufficient minimum contacts with North Carolina to justify the exercise of personal jurisdiction over it without violating due process;

      2.      Defendant's acts fall within the ambit of N.C.G.S. §1-75.4(4) and (5) of the North Carolina "long arm statute";

      3.      Beyond the application of the "long arm statute", the exercise of personal jurisdiction over Defendant does not violate the principles of constitutional due process because the existence of personal jurisdiction over Defendant is pursuant to a sufficient connection between Defendant and North Carolina which makes it fair to require defense of the instant action in North Carolina;

      4.      Defendant has purposefully availed itself of the privileges of conducting activities within North Carolina;

      5.      As will be demonstrated in the "Statement of Facts" section of this Brief, Plaintiff has proffered evidence regarding Defendant that is sufficient to meet its *prima facie*

burden of showing that Defendant carried on sufficient minimum contacts within this State to fall within North Carolina's "long arm statute" and to satisfy the due process requirements.

6.      With regard to the portion of Defendant's Motion to Dismiss which alleges that Plaintiff has failed to state a claim for relief, presumably under Fed. R. Civ. P. Rule 12(b)(6), Plaintiff acknowledges that the standard to govern the sufficiency of the complaint presumes well pleaded allegations, and it is only those pleadings the Court is charged to deem true. Plaintiff's Complaint is precise and is corroborated by exhibits attached to Plaintiff's Complaint and therefore meets the Rule 12(b)(6) burden.

## II. STATEMENT OF FACTS

Plaintiff LC America, Inc (hereinafter "LC") is a wholly owned subsidiary of Le Casselle S.r.l. (hereinafter "Le Caselle") an Italian producer of semi-finished snack food pellets. LC was chartered by the North Carolina Secretary of State on April 5, 2011[1] to conduct the parent company's business within the NAFTA Treaty countries, including the continental United States. LC is the general agent in the United States for Le Caselle.[2]

Prior to September 2012, Defendant engaged Blue Tractor Foods, LLC (hereinafter "Blue Tractor"), an Ohio limited liability company, to order a certain quantity of unfinished snack food pellets and to process them into a finished product.[3] Defendant contends that a written contract existed between Blue Tractor and Defendant for the processing of these snack food pellets. On

---

[1] Exhibit A.

[2] Cazzaniga Affidavit.

[3] Verified Complaint Paragraph 6.

3

Plaintiff's counsel's complaint to Defendant's counsel that the exhibits evidencing said written contract were missing from Defendant's Motion to Dismiss, Defendant's counsel produced an unsigned "Raw Material Purchase Agreement" which refers to written purchase orders, none of which were attached thereto.   The unsigned "Raw Material Purchase Agreement" states, among other things, that:

> "It is hereby agreed that Blue Tractor will only purchase raw ingredients based upon written purchase orders from the customer and should for any reason, except for finished product quality, the customer cancel said orders and not take delivery of the finished product to utilize the raw ingredients <u>purchased by Blue Tractor,</u> the customer agrees to reimburse Blue Tractor for the <u>delivered cost of the materials</u>."[4]

Not only has Defendant not paid Blue Tractor for the raw ingredients, but they have likewise taken delivery, processed the snack food pellets, sold them at a profit and failed to reimburse anyone, whether Blue Tractor or the product supplier LC / La Caselle.  While the document is not signed by Blue Tractor, it is signed by Defendant.  Pursuant to N.C.G.S. §25-2-201(1), the UCC Statute of Frauds, (presumably the identical provision enacted and in effect in Ohio and New York), provides that the contract is not required to be signed by both parties, but only the party to be bound under the contract, i.e. the Defendant.  Following a purchase order from Blue Tractor to Le Caselle, Le Caselle issued two invoices, the first on September 10, 2012, in the amount of Sixty Thousand Nine Hundred Sixteen and 05/100 Dollars ($60,916.05)

---

[4] Exhibit B.

4

identified as invoice #108[5], and the second invoice dated September 27, 2012, in the amount of Twenty Five Thousand Nine Hundred Thirty Eight and 12/100 Dollars ($25,938.12) identified as invoice #105[6]. Blue Tractor took delivery of both containers on December 19, 2012. On December 21, 2012, Blue Tractor was advised by Defendant not to process the containers of pellets and was ordered to transfer them to Defendant's facility in York, Pennsylvania.[7]

On that date, Blue Tractor assigned the Le Caselle invoices to Defendant with the understanding that Defendant would pay the invoices directly to LC / Le Caselle. Between December 26, 2012, and January 4, 2013, Blue Tractor's employees unloaded both containers containing 2,053 cases of snack food pellets which were then loaded onto thirty seven (37) pallets. All thirty seven pallets (37) were delivered and then loaded onto a truck owned by Nirvana Transport, a trucking company owned by Defendant, which took possession and delivery of the entire order of both containers between December 26, 2012 and January 4, 2013.[8] Despite promises to do so, Defendant has refused to pay LC for the two container loads of pellets received, processed, marketed and sold at a profit by Defendant.

---

[5] Exhibit A to Complaint

[6] Exhibit B to Complaint.

[7] Exhibit C to Complaint.

[8] Exhibit D to Complaint.

5

Clearly, there is an identity of interest between LC and Le Caselle. LC has full authority to collect receivables on goods manufactured overseas by Le Caselle.[9]

The uncontroverted facts are as follows:

1. LC is a general agent and owned by Le Caselle and has full authority to transact business in the United States on behalf of Le Caselle.

2. Blue Tractor ordered two ocean containers of snack food pellets from Le Caselle.

3. Blue Tractor took delivery of the shipment.

4. Neither LC nor Le Caselle has been paid for either container load and is presently owed Eighty Six Thousand Eight Hundred Fifty Four and 17/100 Dollars ($86,854.17).

5. Prior to the containers being unloaded at Chagrin Falls, Ohio, Defendant ordered Blue Tractor not to process the pellets and to arrange delivery to Defendant.

6. Blue Tractor unloaded both containers and loaded them onto Defendant's truck at Chagrin Falls, Ohio.

7. The shipment was delivered to York, Pennsylvania to another "co-processor" of snack foods.

---

[9] Cazzaniga Affidavit and Affidavit Exhibit A.

6

8. The pellets furnished by Le Caselle were delivered to Defendant. In fact, Defendant makes no mention in its Memorandum of the disposition of the product furnished by Le Caselle.

9. Defendant has not paid either LC or Le Caselle, or anyone else, for the two product deliveries to Defendant, and Defendant does not deny that it processed the product and sold it at a profit.

10. On January 17, 2013, Defendant issued a purchase order for one container load of snack food pellets which was confirmed by Le Caselle's invoice dated February 14, 2013, and accompanied by an ocean Bill of Lading.[10]

11. On March 14, 2013, Defendant wire transferred to Plaintiff the sum of Fifty Seven Thousand Two Hundred Eighty Three and 20/100 Dollars ($57,283.20) in payment of the invoice.[11]

12. Defendant's officers traveled to North Carolina on April 9, 2013, and met with Plaintiff's officers.[12]

13. Defendant markets it Nirvana water and snack foods online throughout the United States, including North Carolina. [13]

---

[10] Exhibit C.

[11] Cazzaniga Affidavit Exhibit C .

[12] Cazzaniga Affidavit and Defendant's Memorandum.

7

14. Plaintiff was a third party beneficiary of the Blue Tractor / Nirvana contract (Defendant contends Plaintiff was an incidental beneficiary. Plaintiff contends that Plaintiff was a creditor beneficiary.)[14]

15. Defendant was enriched by the receipt of Plaintiff's product. (Defendant contends it was not unjustly enriched).[15]

Beginning in February and continuing through April 13, 2013, there were numerous e-mail communications between LC, LC's counsel, and Nirvana regarding the ongoing dispute over the subject matter of this lawsuit.[16]

Defendant a) accepted the goods; b) did not reject the goods within a reasonable time after delivery or otherwise, and c) did not revoke its acceptance of the goods within any reasonable time after delivery or otherwise.

In early January, 2013, Nirvana contracted with LC / Le Caselle for purchase of another shipment of snack food pellets.[17]  Terms were COD.  On March 14, 2013, Defendant wire transferred to LC the sum of Fifty Seven Thousand Two Hundred Eighty Three and 20/100

---

[13]  Exhibit D.

[14] Verified Complaint, Cazzaniga Affidavit and Defendant's Memorandum.

[15] Id.

[16] Cazzaniga Affidavit.

[17] *Id*. Exhibit C.

Dollars ($57,283.20) in payment under the terms of the new contract.[18]  On March 18, 2013, Defendant issued a check to Plaintiff in the amount of Six Hundred and 00/100 Dollars ($600.00).[19]  Defendant received the product on payment of the full amount.  On April 9, 2013, Darya Rafizadeh, Joseph Cimino and John Napolitano, Vice Presidents of Defendant, traveled to Colfax, North Carolina to meet with Plaintiff's officers.  The meeting was specifically convened for the purpose of discussing the dispute over the subject invoices.[20]  Neither Blue Tractor nor Blue Tractor's creditors have ever asserted a claim against Defendant despite the passage of fourteen months since the shipment was transferred to Defendant.  Plaintiff has never been paid for invoices #105 and #108.  Blue Tractor has never been paid for invoices #105 and #108.

In August, 2013, Plaintiff's counsel forwarded to Defendant's counsel an Indemnity Agreement[21] fully indemnifying Nirvana from any claims asserted by Blue Tractor (which are non-existent).  The Indemnity Agreement took away the final excuse Defendant had for not paying the invoices.  Defendant refused to sign the Indemnity Agreement.

The factual assertions set forth in Defendant's Memorandum rely principally on statements made by Darya Rafizadeh.  There appear to be substantive issues of credibility with Mr. Rafizadeh's statements.

---

[18] *Id*. Exhibit C.

[19] Id. Exhibit D .

[20] *Id*.

[21] Id. Exhibit F.

Plaintiff addresses the inconsistencies as follows:

1.  "I have been the President of Nirvana Specialty Foods, Inc since its inception."  The company reported to the Utica Observer-Dispatch newspaper on April 9, 2012, that Mozafar Rafizadeh was company President and CEO.

2.  In a statement to the media dated August 21, 2013, Darya Rafizadeh stated he was Senior Vice President of Sales and Marketing. [22]

3.  Dunn & Bradstreet credit report shows Mozafar Rafizadeh as being President.[23]

4.  In a statement to Profile magazine, Darya Rafizadeh stated that he is Vice President of Sales, having joined the company just three years ago after graduating from college.[24]

5.  Paragraph 3: Darya Rafizadeh mentions a "brief trip to meet with LC America in mid 2013 to discuss purchasing product from Le Caselle s.r.l. directly …".  In fact, three corporate executives came to Colfax, North Carolina to discuss specifically the pending dispute over the

---

[22] Exhibit E.

[23] Exhibit F.

[24] Exhibit G.

10

invoices which are the subject matter of this lawsuit.[25]

6.  Paragraph 4: "Nirvana has never advertised, promoted or marketed itself, directly or indirectly, in North Carolina". In fact, North Carolina residents can purchase spring water and snacks from Nirvana.[26] See also, Profile magazine "…but before long the company was contracting with major retailers like Walmart and 7-Eleven."[27] 7-Eleven has fifty five locations in Charlotte alone and Walmart has twelve.

7.  Paragraph 5: Reference to a contract between Blue Tractor and Nirvana as Exhibit A. See Previous Discussion.

8.  Paragraph 6: "In fact, Nirvana issued purchase orders to Blue Tractor …". No purchase orders are attached.

9.  Paragraph 7: The lawsuit does not allege a contract with Nirvana.

10. Paragraph 8: "Nirvana has not received a release from Blue Tractor …". In fact, Defendant has used this ploy repeatedly. In August, 2013, Plaintiff's counsel forwarded to Defendant's counsel an Indemnity Agreement fully indemnifying Nirvana from any claims asserted by Blue Tractor (which are non-existent). Defendant refused to sign the

---

[25] Cazzaniga Affidavit .

[26] Exhibit D.

[27] Exhibit G.

agreement and pay the invoices.[28]

11. Paragraph 9: "Some of the product that Blue Tractor did provide to Nirvana was damaged, and, therefore worthless." It has been over one year since the goods were delivered to Nirvana. This is the first time this claim has been made.[29] "Nirvana is uncertain whether any of the product it received from Blue Tractor actually came from Le Caselle." In fact, the two invoices were delivered to Nirvana prior to transfer of the product. The invoices clearly state 'Le Caselle' at the top.

12. Paragraph 10: "… Nirvana does not own a facility in Pennsylvania." There is no contention that they do. They outsource finished product processing, as they did with Blue Tractor.

Equally disconcerting, Defendant's Memorandum is confusing in several aspects as follows:

1. Section 3.2 cites N.C.G.S. §25-1-105 (a section dealing with severability) and concludes that Ohio law should control followed by several citations to Ohio law regarding third party incidental beneficiaries.

2. The following page proposes that Defendant pay Le Caselle for the invoices. Since there is unquestionably an identity of interest with LC and

---

[28] Cazzaniga Affidavit Exhibit F.

[29] Riley Affidavit.

12

Le Caselle, Le Caselle would be pleased to receive payment from Defendant.  Defendant acknowledges the communication with Blue Tractor and the expectation that the invoices would be paid promptly, but Defendant has arbitrarily refused to pay anyone.  Defendant characterizes the Blue Tractor letters as "fishy, unverified" and suggests that they are meaningless, in the face of all the evidence to the contrary.

3.  Defendant attempts to raise the affirmative defense of the Statute of Frauds, again under Ohio law, which is clearly a defense to be raised in an Answer and not in a Motion to Dismiss.  The invoices in question are clearly "confirming memoranda" and, without question, satisfy the Statute of Frauds, which is, again, an issue that is not before the Court at this time.  Defendant further contends that the incidental beneficiary rule would prevent LC from becoming an intended beneficiary under some convoluted theory.

4.  Section 3.4 contends that the unjust enrichment count fails.  This is more appropriately raised as a defense in Defendant's Answer and is not before the Court at this time.  Clearly, the Ohio case cited by the Defendant proves unequivocally that the Defendant owes either Le Caselle or LC the full amount of the invoices.

13

## III. ARGUMENT

### A. Defendant's Contacts With North Carolina Are Sufficient to Justify the Exercise of Personal Jurisdiction

The Plaintiff can make out a prima facie showing that jurisdiction exists. When, as here, the Court relies on the complaint and affidavits alone, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *In re Celotex Corp.,* 124 F.3d 619, 628 (4th Cir.1997) (quoting *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). "In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* at 628.

[I]n order for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001). The [North Carolina] General Assembly intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process. *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). "Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of

14

fair play and substantial justice." *Christian Sci.,* 259 F.3d at 215 (internal quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

A court may have personal jurisdiction over a defendant through either general or specific jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). "[I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State. To establish general jurisdiction over the defendant, the defendant's activities in the State must have been continuous and systematic, a more demanding standard than is necessary for establishing specific jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir.2002) (internal quotation marks omitted). Specific jurisdiction exists when the "suit aris[es] out of or is related to the defendant's contacts with the forum ..." *Helicopteros,* 466 U.S. at 414.

In *ALS Scan,* the Fourth Circuit articulated its controlling test regarding personal jurisdiction in the context of internet-based forum contacts. *ALS Scan, Inc.*, 293 F.3d at 707. The court may only exercise judicial power over a person outside of the State when that person "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 714.

When the internet activity is, as here, the alleged posting of information on a website, the Fourth Circuit's opinion in *Young v. New Haven Advocate* refines the Court's analysis. 315 F.3d 256, 263 (4th Cir.2002); *Dailey v. Popma,* 662 S.E.2d 12, 14 (N.C.Ct.App.2008) ("we adopt the

Fourth Circuit's refinement of that test in *Young v. New Haven Advocate"*). Under *Young,* the Court must ask whether the individual making the post manifested an intent to direct his website content to the specific forum's audience. 315 F.3d at 263. "[A] person's act of placing information on the Internet" is not sufficient to "subject[ ] that person to personal jurisdiction in each State in which the information is accessed." *ALS Scan,* 293 F.3d at 714. Otherwise, a "person placing information on the Internet would be subject to personal jurisdiction in every State," and the traditional due process principles governing a State's jurisdiction over persons outside of its border would be subverted. *Id.* Thus, the fact that a posters' website posts may be accessed anywhere, does not by itself demonstrate that the posters were intentionally directing their website content to the forum's audience. *Young,* 315 F.3d at 263. Something more than posting and accessibility is needed to indicate that the posters purposefully directed their activity in a substantial way to the forum state. *Id.* In sum, the website posters must, through the internet postings, manifest an intent to specifically target and focus on North Carolina readers. *Id* at 263; *Dailey,* 662 S.E.2d at 19 (requiring showing of intent to target content on Internet bulletin board to audience in forum state to support jurisdiction).

Moreover, the Fourth Circuit has also adopted the model set forth by the Western District Court of Pennsylvania, wherein the District Court concluded that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the internet. *Zippo Mfr. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *Zippo* recognizes a "sliding scale" for defining when electronic contacts with the state are sufficient. The *Zippo Court* set forth the following

16

paradigm:

> "At one end of the spectrum are situations where a defendant clearly does business over the internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end of the spectrum are situations where a defendant has simply posted information on an Interest Web site which is accessible to users in foreign jurisdictions. A passive website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." *Id.* at 1124.

The *ALS Court* specifically adopted and adapted the *Zippo* paradigm for when a foreign Defendant's internet activity will subject it to personal jurisdiction as follows: "[W]e conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity within the state, (2) with the manifested intent of engaging in business or other interactions within the state, and (3) that activity creates in a person within the state, a potential cause of action recognizable in the state's courts. *ALS Scan, Inc.,* 293 F.3d at 714.

Admittedly, the Defendant is not chartered in North Carolina nor is it qualified to do business as a foreign corporation in North Carolina. Nor does it own real or personal property,

17

maintain an office or possess an agent for service of process. However, Defendant is a party to a contract requiring it to perform an obligation within the state of North Carolina as noted herein.

N.C.G.S. 1-75.4(5)(c) and (d) state that where a party is engaged in any action which:

(c) Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to deliver or receive within this State, or to ship from this State goods, documents of title, or other things of value; or

(d) Relates to goods, documents of title, or other things of value shipped from this State by the plaintiff to the defendant on his order or direction.

It is undisputed that the Defendant entered into a contract in January, 2013 for the purchase of a container of pellets to be delivered to the Port of New York. Following the issuance by Le Caselle of its invoice to Defendant, Defendant wire transferred the sum of Fifty Seven Thousand Two Hundred Eighty Three and 20/100 Dollars ($57,283.20) to Plaintiff's bank, BB & T, in Greensboro, North Carolina. Clearly the wire transfer of money to North Carolina was a transfer of "things of value".

With regard to the Defendant's internet activity, Plaintiff contends that Defendant has entered the state through electronic contacts via the internet. The Defendant clearly does business over the internet and regularly enters into contracts with residents of the State of North Carolina through the sale of its spring water and snack food products and earns a profit therefrom. Plaintiff respectfully request the Court to adopt and adapt the *Zippo* model providing that a state may, consistent with due process, exercise judicial power over a person outside the state when that person (i) directs electronic activity within the state, (ii) with the manifested

intent of engaging in business or other interactions within the state, and (iii) that activity creates in a person within the state, a potential cause of action recognizable in the state's courts.

In sum, the Defendant has established contacts with the State of North Carolina sufficient to justify the exercise of personal jurisdiction based on the following facts:

1.    Defendant has marketed the sale of its water online and has entered into contracts with residents of the State of North Carolina through the sale of said water earning substantial profits therefrom.  Defendant's activities in the marketing and sale of its water to residents of the State of North Carolina satisfied all the requirements set forth by the *ALS Court* for when a foreign Defendant's internet activity will subject it to personal jurisdiction.  *See also, Inset Sys., Inc. v. Instruction Set***,** 937 F. Supp. 161 (D. Conn. 1996) where the court exercised personal jurisdiction reasoning that advertising on the internet constituted the purposeful doing of business in Connecticut because " … unlike television and radio advertising, the advertisement is available continuously to any Internet user."  *See also, Maritz, Inc. v. CyberGold, Inc*. 947 F. Supp. 1328 (D. Mo. August 19, 1996), the court reasoned that Defendant's conduct amounted to "active solicitations" and "promotional activities".  When a defendant makes a conscious choice to conduct business with the residents of a foreign state, "it has clear notice that it is subject to suit there".[30]

2.    In addition to Defendant's active internet activity, Defendant has also made the conscious choice to market its products for sell in fifty-five 7-Eleven stores located in the State of North Carolina and twelve Walmart stores located in the State of North Carolina.

---

[30] World-Wide Volkswagen Corp. 444 U.S. at 297, 286, 100 S.Ct. at 567.

3.   In early January, 2013, Nirvana contracted with LC / Le Caselle for purchase of another shipment of snack food pellets.[31]

4.   On March 14, 2013, Defendant wire transferred to LC's bank account housed at the Branch Banking and Trust Company ("BB&T) located in Greensboro, North Carolina, the sum of Fifty Seven Thousand Two Hundred Eighty Three and 20/100 Dollars ($57,283.20) in payment under the terms of the new contract.[32]

5.   On March 18, 2013, Defendant issued a check to Plaintiff in the amount of Six Hundred and 00/100 Dollars ($600.00).[33]

6.   On April 9, 2013, Darya Rafizadeh, Joseph Cimino and John Napolitano, Vice Presidents of Defendant, traveled to Colfax, North Carolina to meet with Plaintiff's officers.   The meeting was specifically convened for the purpose of discussing the dispute over the subject invoices.[34]

In its Memorandum, the Defendant makes no mention of these facts other than a reference to a brief North Carolina meeting.   In short, Plaintiff has investigated and discovered Defendant's contacts with North Carolina unilaterally, and without a full and truthful disclosure of North Carolina activities by Defendant.   Plaintiff's investigation has revealed that Defendant

---

[31] *Id*. Exhibit C.

[32] *Id*. Exhibit C.

[33] Id. Exhibit D .

[34] *Id*.

20

has in fact purposefully availed itself of the privileges of conducting activities within North Carolina by carrying on sufficient minimum contacts within this State to fall within North Carolina's "long arm statute" and to satisfy the due process requirements. Based on the foregoing, Defendant is subject to personal jurisdiction within the State of North Carolina.

**B. Defendant's Motion to Dismiss for Failure to State a Claim Should be Denied.**

**1. <u>Rule 12(b)(6) Standard Of Review</u>**

Upon review of a Rule 12(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Fair v Gaston Cty Family YMCA,* No. 3:11-cv-524, at * 2 (W.D.N.C. June 12, 2012). This Court has routinely followed the principle espoused by the United States Supreme Court which provides that a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Id. (quoting Bell Atlantic Corp. v Twombly,* 550 U.S. 544, 555 (2007). The *Twombly* Court further held that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id. (quoting Twombly,* 550 U.S. at 563). A Rule 12(b)(6) motion to dismiss should be denied if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Id. (quoting Ashcroft v Iqbal,* 129 S.Ct. 1937, 1960 (2009) and *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. (quoting Iqbal,* 129 S.Ct. at 1949).

Case 3:13-cv-00625-RJC-DCK   Document 11   Filed 02/28/14   Page 21 of 25

The *Iqbal* Court set forth a useful two pronged approach for determining whether a complaint meets the plausibility standard set forth above. *Id.* at 3. The first prong requires the court to identify "allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 3 *(quoting Iqbal,* 129 S.Ct. at 1951). In other words, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* at 3. *(quoting Twombly,* 550 U.S. at 554-55). After determining that the complaint does contain well-pleaded allegations, the second prong of the plausibility standard requires the court to assume the truth of the allegations and then "determine whether they plausibly give rise to an entitlement for relief." *Id.* at 3. (*quoting Iqbal,* 129 S.Ct. at 1951). This provision has been interpreted to mean that if "after taking the complaint's well-pleaded factual allegations as true, a lawful alternative explanation appears a more likely cause of the complained of behavior, the claim for relief is not plausible." *Id.* at 3 *quoting Iqbal,* 129 S.Ct. at 1951-52).

In accordance with *Iqbal* and *Twombly,* Plaintiff's Verified Complaint sets out in detail the events that support Plaintiff's claims for relief, all of which set forth enough facts to state a claim for relief that is plausible on its face. This includes the issuance of the invoices to Blue Tractor, the assignment and transfer of the invoices to Defendant, and the assignment and transfer of the shipment to Defendant, all with exhibits attached. Plaintiff's Complaint further verifies that Defendant accepted the shipments pursuant to an express or implied contract between Defendant and Blue Tractor and the concept of Plaintiff being a third party creditor beneficiary of the Blue Tractor – Nirvana contract.

Defendant asserts in its Memorandum that Plaintiff has not stated a cause of action as to Count 1 which alleges that Plaintiff is a creditor beneficiary. Defendant agrees that Plaintiff is a third-party beneficiary but asserts that Plaintiff is only an incidental beneficiary and not a creditor beneficiary. As a general rule, members of the public are held to be incidental beneficiaries of contracts entered into by their municipalities or other governmental units in the regular course of carrying on governmental functions. Cases involving incidental beneficiaries in the context of governmental or municipal contracts constitute the bulk of incidental beneficiary cases. On the other hand, if Defendant accepted delivery of the product and accepted the proffered invoices that accompanied the product, then Defendant intended to satisfy a legal duty that it owed to a third party, i.e., the Plaintiff. A facsimile of the Blue Tractor / Nirvana Contract, as herein presented, clearly established a creditor beneficiary's rights against both Blue Tractor (because of the original obligation) and the Defendant, who accepted the product and the invoices.

Likewise, in Count Two, Plaintiff has alleged that a benefit has been conferred upon Defendant, Defendant knowingly accepted the benefit and retained it under circumstances that make it unjust to do so without paying for it. Based on the foregoing, Plaintiff respectfully requests the Court to deny Defendant's Motion to Dismiss pursuant to Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendant's Motion to Dismiss in its entirety.

23

This the 28th day of February, 2014.

                                    s/ J. Jerome Miller
                                    J. Jerome Miller
                                    N.C. Bar No. 6767
                                    Carol L. Austin
                                     N.C. Bar No. 41080
                                    Miller Walker & Austin
                                    Attorneys at Law
                                    319 S. Sharon Amity Road, Suite 350
                                    Charlotte, North Carolina 28211
                                    Tel.: 704-366-9129
                                    Fax: 704-366-2686
                                     jerry@millerlawcharlotte.com

24

CERTIFICATE OF SERVICE

I hereby certify that on 28th February, 2014, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following:

> Michael A. Durr
> Quist, Cone & Fisher, PLLC
> 800 South Gay Street, Suite 2121
> Knoxville, TN 37929
> Direct: 865.312.0440
> E-mail: mdurr@qcflaw.com

> F. Douglas Banks
> Law Offices of Doug Banks
> 10801 Johnston Road, Suite 218
> Charlotte, NC 28226
> Office:  704-512-0484
> Email:  dbanks@banks-law.net

This the 28th day of February, 2014.

> s/ J. Jerome Miller
> NC Bar No.: 6767
> Attorney for the Plaintiffs
> Miller Walker & Austin
> Attorneys at Law
> 319 S. Sharon Amity Road, #350
> Charlotte, North Carolina 28211
> Tel.: 704-366-9129
> Fax: 704-366-2686
> jerry@millerlawcharlotte.com